# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KENNETH MOORE, JR., | Civil Action No. 13 – 1405 |
| Plaintiff, | District Judge Nora Barry Fischer |
| v. | Magistrate Judge Lisa Pupo Lenihan |
| J. BARRY JOHNSON, MAJOR SHIRLEY, JOHN WETZEL, CAPTAIN B. O'DONNELL, MARUSA, | ECF No. 30 |
| Defendants. | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

For the following reasons, it is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 30) be granted.

### II. REPORT

Plaintiff Kenneth Moore, Jr. is an inmate who is currently incarcerated at the State Correctional Institution Greene ("SCI-Greene"). However, this action stems from events that occurred while Plaintiff was an inmate at the State Correctional Institution Pine Grove ("SCI-Pine Grove"). His Complaint alleges that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution, as well as his right to Equal Protection and rights under the Americans with Disabilities ("ADA") Act. Defendants are J. Barry Johnson, Superintendent at SCI-Pine Grove; Shirley, Major at SCI-Pine Grove; B. O'Donnell, Intelligence Captain at SCI-Pine Grove; Marusa, Psychology Staff Member at SCI-Pine Grove; and John Wetzel,

Secretary of the Pennsylvania Department of Corrections. Collectively, Defendants have filed a Motion for Summary Judgment, to which Plaintiff has filed a Brief in Opposition. The Motion is now ripe for review.

**A. Factual History**

In February 2010, Plaintiff was taken from the general population and placed in solitary confinement, or more commonly referred to as the Restricted Housing Unit ("RHU"). (ECF No. 1, Compl. at ¶ 12.) Plaintiff contends that he was moved into the RHU due to an investigation into the murder of an inmate in which he was alleged to have been involved. *Id.* However, Defendants have informed the Court that the murder occurred on February 28, 2010, while Plaintiff was already in the RHU.[1]

Plaintiff contends that from March 1, 2010 until late September 2011, he was placed on strict restrictions at the direction of Defendants Johnson, Shirley, O'Donnell, and Wetzel. Id. at ¶ 13. These restrictions allegedly included the denial of writing utensils, the right to file and exhaust grievances, and the right to correspond with his attorney, family and friends. *Id.* He also alleges that his outgoing and incoming mail was "continuously confiscated". *Id.*

Plaintiff claims that these restrictions hindered his ability to aid his attorney who was representing him in his PCRA proceedings,[2] and thus hindered his attorney's ability

---

[1] Inmate William Brown brutally murdered his cellmate, Jayson Stewart, on February 28, 2010 at SCI-Pine Grove. Plaintiff and his cellmate, Lawrence Maiden, were in the cell directly above Brown and Stewart. In order to get into Plaintiff's and Maiden's good graces due to gang issues, they demanded that Brown kill Stewart as an indication of his worthiness to be associated with the gang. Plaintiff and Maiden "fished" a razor blade to Brown which he used in the murder. Plaintiff plead guilty to his involvement in the murder at *Commonwealth v. Moore*, CP-32-CR-0000391-2011, Court of Common Pleas of Indiana County.

[2] *Commonwealth v. Moore*, CP-09-0006745, 2005, Court of Common Pleas of Bucks County.

2

to effectively represent him in those proceedings. *Id.* at ¶ 14. Plaintiff claims that he verbally complained and filed numerous grievances and complaints about these restrictions, but the restrictions approved by Defendants Johnson, Shirley, O'Donnell and Wetzel persisted. *Id.* at ¶ 15.

Plaintiff next claims that he was denied mental health treatment by his assigned Psychology staff member, Defendant Marusa, who allegedly refused to speak to Plaintiff during her weekly visits. *Id.* at ¶ 19. Plaintiff contends that DOC policy mandates that all RHU inmates be seen by a psychologist or psychiatrist for a mental health assessment every thirty days and be given an annual psychological or psychiatric examination if they are continuously confined in the RHU for a period of one year. *Id.* at ¶¶ 16-17. According to Plaintiff, he never received any psychological or psychiatric treatment while in the RHU. *Id.* at ¶ 20. He states that he attempted to file a grievance regarding the denial of mental health treatment, but he could not exhaust his administrative remedies because prison officials intercepted his grievances. *Id.* at ¶¶ 23-24.

**B. Standard of Review**

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that

demonstrates the absence of a genuine issue of material fact. *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson*, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. *Anderson*, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *J.F. Feeser, Inc., v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990).

**C. Discussion**

1. Statute of Limitations

Defendants first submit that Plaintiff's claims are barred by the statute of limitations. Plaintiff seeks recovery against Defendants under 42 U.S.C. § 1983. The limitations period for civil actions brought under 42 U.S.C. § 1983 is determined by state

law.[3]  Under Pennsylvania law, the applicable limitations period for civil rights actions asserted under 42 U.S.C. § 1983 is two years.  *See* 42 Pa. C.S. § 5524.

The date when a civil rights action accrues (begins to run) is a matter of federal law.  *Albright v. Oliver*, 510 U.S. 266, 280 n.6 (1994) (J. Ginsburg, concurring).  A claim accrues when the plaintiff becomes aware, or should have become aware, of both the fact of injury and its causal connection to the Defendant.  *See Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (it is the wrongful act that triggers the state of the limitations period); *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1127 (3d Cir. 1988) (a federal cause of action accrues when the plaintiff is aware, or should be aware, of the existence of and source of injury, not when the potential claimant knows or should know that the injury constitutes a legal wrong).

Plaintiff filed his Complaint in the Middle District of Pennsylvania, Scranton Division.  Although Plaintiff dated his Complaint May 31, 2013, it was received by the Clerk's Office in Scranton on September 24, 2013.

Defendants assert that Plaintiff pre-dated his Complaint.  In support of their position, they have submitted the cash slip that Plaintiff filled out in order to pay for the postage necessary to mail his Complaint to the Middle District.  (ECF No. 33-1, Defs.' Ex. A, App. at p.2.)  On the cash slip, Plaintiff wrote, "[p]lease deduct postage for legal material sent to the middle district," and the cash slip indicates that the postage amounted to $5.32.  *Id.*  Additionally, Plaintiff's Offender Transaction History Form shows that postage in the amount of $5.32 was deducted from his account on

---

[3] *See Goodman v. Lukens Steel Correctional Officer*, 482 U.S. 656, 662 (1987) (42 U.S.C. § 1981); *Wilson v. Garcia*, 471 U.S. 261, 272-76 (1985) (42 U.S.C. § 1983); *Bougher v. University of Pittsburgh*, 882 F.2d 74, 79 (3d Cir. 1989) (42 U.S.C. § 1985).

September 17, 2013. (ECF No. 33-1, Defs.' Ex. B, App. at p. 4.) Because the Complaint was date stamped by the Clerk's Office as being received on September 24, 2013, the record supports Defendants' position that Plaintiff did in fact pre-date his Complaint.

Plaintiff denies this allegation and maintains that, according to the prison mailbox rule, his Complaint was filed on May 31, 2013 because that was the day he handed over his Complaint to prison officials for mailing. This appears to be an untrue assertion. The Court notes that Plaintiff dated the cash slip August 13, 2013; and while Dean Geehring, the mailroom supervisor at SCI-Greene, declares that the date an inmate puts on a cash slip "means nothing", in this case it begs the question of why Plaintiff would date his cash slip over two months after he dated his Complaint. *See* (ECF No. 33-1, Defs.' Ex. A, App. at p.2; Defs.' Ex. C, App. at p.6.) Although the record supports Defendants' position that Plaintiff's Complaint was likely filed on September 17, 2013, the earliest Plaintiff could have possibly handed over his Complaint for mailing would have been August 13, 2013. Thus, the undersigned will assume, without deciding, that Plaintiff's Complaint was filed on that day. However, due to the two-year limitations period, Plaintiff cannot impose liability against Defendants based on events that occurred prior to August 13, 2011.

Unfortunately for Plaintiff, he pleads with no specificity what occurred on what days. He only alleges that he was subject to strict restrictions from March 1, 2010 until late September 2011. This is insufficient to meet the pleading standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Because it is unknown what exactly occurred after August 13, 2011, Defendants' Motion

should be granted on the basis that Plaintiff's Complaint is time-barred. Alternatively, for the reasons set forth below, Defendants are entitled to summary judgment on the merits of Plaintiff's claims.

2. <u>First Amendment</u>

Plaintiff appears to allege several violations of his Firth Amendment rights. (ECF No. 1, Compl. at ¶ 26.) Each alleged violation will be addressed in turn. However, the undersigned first notes that Plaintiff's Complaint and Brief in Opposition to summary judgment is woefully lacking in details. Besides one statement that the alleged violations occurred between March 2010 and September 2011, Plaintiff provides no specific dates as to what occurred and when. Therefore, the undersigned cannot address the alleged violations as if they were separate, discreet acts. Instead, they will be addressed "generally".

First, Plaintiff claims that he was denied the right to file grievances and exhaust his administrative remedies. Defendants, however, have submitted eleven (11) grievances that Plaintiff filed from March 10, 2010 to September 12, 2011. *See* (ECF No. 33-1, Ex. E, App. at pp.12-29; Ex. F, App. at pp.31-32.) This fact belies this claim and also Plaintiff's next claim that he was denied writing utensils. Moreover, Plaintiff had the forms and writing utensils necessary to defend himself in misconducts issued in March, April and May of 2010. *See* (ECF No. 33-1, Ex. G, App. at pp.34-47.) Because Plaintiff has not pointed to any one particular time during which he was denied writing utensils or the right to file a grievance, and the evidence of record suggest otherwise for the time period in question, summary judgment should be granted in favor of Defendants on this claim.

Next, Plaintiff claims that he was denied the right to correspond with his family and friends because his mail was "continuously confiscated". Defendants dispute this allegation. They maintain that Plaintiff's mail was not confiscated but instead monitored because of information the prison had that Plaintiff was either a member of or affiliated with the Bloods gang, a recognized Security Threat Group (STG).[4] *See* (ECF No. 33-1, Defs.' Ex. D, App. at pp.9-10.) Specifically, Plaintiff had been in contact with a gang member at Rahway State Prison in New Jersey. *Id.* This mail monitoring continued after the Stewart murder because it was discovered through investigation that Plaintiff was involved in the murder. *Id.* The mail was monitored to see if Plaintiff included any information about the murder in his mail. *Id.* Defendants maintain that Plaintiff's mail was not confiscated, just monitored. *Id.* In-coming mail was monitored then given to Plaintiff. *Id.* Out-going mail was monitored and then sent on its way. *Id.*

In *Caldwell v. Beard*, 2008 WL 5397645, at *4 (3d Cir. 2008), the Third Circuit Court of Appeals held that:

> [t]he Supreme Court has recognized that prisoners have protected First Amendment interests in both sending and receiving mail. *See Thornburgh v. Abbott*, 490 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The Court has also recognized, however, that the rights of prisoners "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Thornburgh*, 490 U.S. at 407, 109 S.Ct. 1874 (quoting *Turner*, 482 U.S. at 85, 107 S.Ct. 2254). The opening and inspecting of Caldwell's outgoing mail is reasonably related to the legitimate penological interest of institutional security. *See, e.g., Altizer v. Deeds*, 191 F.3d 540, 547-48 (4th Cir. 1999) (stating that if inmates' outgoing mail could not be opened and inspected "a prison official would never know that a letter contained the very type of material that, according to the Supreme Court, could rightfully be censored, *i.e.*, correspondence

---

[4] "Mail monitoring" is reading through an inmate's incoming and outgoing non-legal mail and is permitted under policy when there is a question concerning all aspects of facility security.

sent by an inmate that would be detrimental to the security, good order, or discipline of the institution; necessary for the protection of the public; or used to facilitate criminal activity"); *Smith v. Delo*, 995 F.2d 827, 830 (8th Cir. 1993) (holding that "[a]lthough there is less of a security risk with outgoing mail precisely because the mail is going out of the prison, *Abbott*, 490 U.S. at 413, 109 S.Ct. 1874, . . . there is also no doubt that prison officials are justified in discovering and refusing to process mail that contains" "escape plans, contraband, threats, or evidence of illegal activity"). Consequently, we agree that prison employees did not violate Caldwell's constitutional rights by inspecting his outgoing non privileged mail.

Plaintiff has not pointed to any one piece of mail that he did not receive or that his intended recipient did not receive, and he even concedes that Defendants actions in monitoring his mail was "reasonably related" to legitimate interests. *See* (ECF No. 40 at p.4.) Plaintiff disputes, however, the length of time that his mail was monitored. This period of time is unknown. Nevertheless, Defendants have adequately shown that because Plaintiff was a security risk, inspecting his mail was necessary even after the death of inmate Stewart. Summary judgment should therefore be granted.

Finally, Plaintiff claims that he was denied his right to access the courts because he was denied his right to communicate with his PCRA attorney, and thus could not aid him in his PCRA proceeding. Plaintiff's own Complaint, however, shows that he in fact had at least some contact with his PCRA attorney. In a letter to Plaintiff from his PCRA attorney dated May 26, 2010, Plaintiff's attorney states that he is enclosing transcripts that Plaintiff *requested*. *See* (ECF No. 1, Compl. at p.12.) This implies that Plaintiff somehow communicated with his attorney that he wanted transcripts and that his attorney received his request. *Id*. Nevertheless, the attorney does make mention that Plaintiff was being denied the ability to communicate with him, possibly because the institution was "not pleased" with Plaintiff's behavior during an earlier video conference.

*Id.* Regardless of the amount of contact Plaintiff had or did not have with his attorney, in order to demonstrate an access to court violation, Plaintiff must show that he suffered some actual, concrete injury in the pursuit of some legal claim. *See Lewis v. Casey*, 518 U.S. 343, 354-55 (1996); *Oliver v. Fauver*, 118 F.3d 175, 177-78 (3d Cir. 1997). Plaintiff did not plead, must less prove such an injury.

Moreover, the right of access to the courts is just that, the right of access. The rule is that where an inmate is represented by counsel, his right of access to the court is satisfied as a matter of law. *Harris v. United States Marshal Serv.*, No. 10-328J, 2011 WL 3607833, at *4 (W.D. Pa. Apr. 6, 2011) (citing cases). Additionally, the right of access to the courts does not include the right to effectively litigate once in court. *Lewis*, 518 U.S. at 354. For these reasons, Defendants are entitled to summary judgment.

3. Eighth Amendment

Plaintiff claims that Defendant Marusa was deliberately indifferent to his medical needs because she refused to provide him with mental health treatment as required under DOC policy. (ECF No. 1, Compl. at ¶ 27.) In order to survive summary judgment, Plaintiff must demonstrate that (1) he was suffering from a "serious medical need," and (2) prison officials were deliberately indifferent to that need. *Gamble v. Estelle*, 439 U.S. 897 (1978). A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988). "Deliberate indifference" requires a showing of

intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993).

The basis for this claim is not explained in Plaintiff's Complaint. However, in his response in opposition to Defendants' Motion he states that Defendant Marusa[5] denied him mental health treatment when she refused to speak to him about nightmares he was having involving the death of inmate Jayson Stewart. According to Plaintiff, Defendant Marusa said that she would not speak to him about this issue because she could be subpoenaed to testify against him.

Putting aside whether Plaintiff has demonstrated the existence of a "serious medical need", the record shows that Plaintiff was given consistent mental health treatment during the period in question. For example, Plaintiff's Individual Cumulative Adjustment Records indicate that Psychological Services Specialist-Corrections Rebecca Bollinger and Defendant Marusa saw Plaintiff twenty-four (24) times between March 1, 2010 and September 8, 2011. (ECF No. 35 *SEALED*, Defs.' Ex. H.) Additionally, there are thirty (30) Mental Health Referral Forms and Mental Health Contact Notes in Plaintiff's mental health records from March 1, 2010 to September 7, 2011, (ECF No. 35-1 *SEALED*, Defs.' Ex. I); there are twelve (12) Outpatient Psychiatric Progress Notes from March 9, 2010 to October 21, 2011, (ECF No. 35-2 *SEALED*, Defs.' Ex. J); and there are eight (8) psychiatric entries on Plaintiff's Physician's Order Forms from March 9, 2010 until July 1, 2011, (ECF No. 35-3

---

[5] Defendant Marusa is not a psychologist. She is a Psychological Services Specialist-Corrections.

*SEALED*, Defs.' Ex. K). Upon review of these records, the undersigned finds that Plaintiff was provided with mental health treatment during the period in question, including treatment to help him with his sleeping problems. Therefore, summary judgment should be granted in favor of Defendants on this claim.

    4. Equal Protection

Plaintiff also claims that he was denied his right to equal protection because other prisoners in the RHU with disabilities or no disabilities were provided with mental health treatment but he was not. (ECF No. 1, Compl. at ¶ 28.) A litigant seeking to establish a viable equal protection claim must show intentional or purposeful discrimination. *Wilson v. Schilinger*, 761 F.2d 921, 929 (3d Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986). However, the Equal Protection Clause "does not deny to States the power to treat different classes of persons in different ways." *Reed v. Reed*, 404 U.S. 71, 75 (1971). The Court of Appeals for the Third Circuit has observed that the Equal Protection Clause "is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.'" *Artway v. Attorney Gen.*, 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985)); *see also Kuhar v. Greensburg-Salem Sch. Dist.*, 616 F.2d 676, 677 n.1 (3d Cir. 1980) ("An equal protection claim arises when an individual contends that he or she is receiving different treatment from that received by other individuals similarly situated.").

There is nothing in the record that suggests Plaintiff was treated differently than similarly situated inmates. In fact, the record illustrates that Plaintiff was provided with

the mental health treatment that he claims he was denied. Summary judgment should therefore be granted.

5. <u>Americans with Disabilities Act</u>

Finally, Plaintiff alleges that he was denied his rights under the ADA. (ECF No. 1 at ¶ 28.) Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II applies to the state prisons. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–10 (1998).

To succeed on a claim under Title II of the ADA, a plaintiff must establish that: (1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability. *Bowers v. National Collegiate Athletic Ass'n*, 475 F.3d 524, 550 (3d Cir. 2007). Plaintiff has neither plead nor proven the elements of an ADA claim.

Plaintiff's ADA claim is premised on his allegation that he was wrongly denied mental health treatment. However, Plaintiff either disagrees with the mental health treatment that he was provided or is dishonest in his claim that he was provided with none. This does not provide a basis for relief under the ADA. *See, e.g., Iseley v. Beard*, 200 F. App'x 137, 142 (3d Cir. 2006); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) ("[P]urely medical decisions . . . do not ordinarily fall within the scope of the ADA or the Rehabilitation Act."); *Burger v. Bloomberg*, 418 F.3d 882 (8th Cir. 2005) (medical treatment decisions are not a basis for ADA claims); *Bryant v.*

*Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (holding that "the [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners . . . [t]he ADA does not create a remedy for medical malpractice."); *see also Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001) ("[A] plaintiff's showing of medical unreasonableness must be framed within some larger theory of disability discrimination."); *Thomas v. Pa. Dep't of Corr.*, 615 F. Supp. 2d 411, 429 (W.D. Pa. 2009) (plaintiff's requests for a handicap cell that were denied based on a medical determination that they were not warranted did not support discriminatory treatment in violation of Title II of the ADA). For these reasons, summary judgment should be granted to Defendants.

### III. **CONCLUSION**

For the foregoing reasons, it is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 30) be granted.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule of Court 72.D.2, the parties are allowed fourteen (14) days from the date of service to file objections to this Report and Recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

Dated: February 19, 2015

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc: Kenneth Moore, Jr.
GM 5717
S.C.I. Greene
175 Progress Drive
Waynesburg, PA  15370
*Via First Class Mail*